# EXHIBIT A

Filing # 135773034 E-Filed 10/01/2021 04:13:19 PM

IN THE CIRCUIT COURT OF THE 4th
JUDICIALCIRCUIT IN AND FOR DUVAL
COUNTY FLORIDA

CIRCUIT CIVIL DIVISION
CASE NO.

BENJAMIN MATHEWS
      Plaintiff,

v.

R.J. REYNOLDS TOBACCO
COMPANY, a foreign corporation, as
successor-by-merger to Lorillard Tobacco
Company, individually and as successor-
in-interest to the U.S. tobacco business of
Brown & Williamson Tobacco Corporation
(n/k/a Brown & Williamson Holdings, Inc.)
and individually as successor-by-merger
to American Tobacco Company, LIGGETT
GROUP, LLC, a foreign limited liability
Company, and VECTOR GROUP LTD., INC.,
a foreign corporation
      Defendants.
_____/

## COMPLAINT FOR DAMAGES

    Plaintiff, BENJAMIN MATHEWS sues Defendants, R.J. REYNOLDS TOBACCO

COMPANY, a foreign corporation; LIGGETT GROUP LLC, a foreign corporation, and

VECTOR GROUP LTD., INC, a foreign corporation, and alleges:

### ALLEGATIONS COMMON TO ALL COUNTS

### PARTIES AND RELEVANT NON-PARTIES

    1.   This is an action for damages that exceeds THIRTY THOUSAND

($30,000.00) DOLLARS, exclusive of costs and fees.

    2.   Plaintiff, Benjamin Mathews, is a resident of the State of Missouri, who was

born on January 21, 1938, in the Bronx, New York.  Mr. Mathews lived in Jacksonville,

Duval County, Florida from 2006 until 2018.

3. Defendant R.J. Reynolds Tobacco Company ("R.J. Reynolds"), individually and as successor-by-merger to Lorillard Tobacco Company ("Lorillard"), individually and as successor-in-interest to the U.S. tobacco business of Brown & Williamson Tobacco Corporation (k/n/a Brown & Williamson Holdings, Inc.), and individually and as successor-by-merger to the American Tobacco Company, is a North Carolina Corporation with its principal place of business located in the State of North Carolina. This Defendant conducts business throughout the United States, including, Duval County, in the State of Florida, and did so during all times relevant to this action.

4. At all times material to this cause of action, American Tobacco Company, to which R.J. Reynolds is the successor by merger, engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of Lucky Strike cigarette products, an unfiltered cigarette that Mr. Mathews smoked.

5. At all times material to this cause of action, R.J. Reynolds engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of the cigarette products, including, among others, Salem, a mentholated filtered cigarette, which Mr. Mathews smoked and inhaled which, in combination with the other cigarettes Mr. Mathews smoked, caused and/or substantially contributed to the development of his lung cancer.

6. As a result of R.J. Reynolds American Inc.'s acquisition of Lorillard Tobacco Company, on June 12, 2015, R.J. Reynolds American Inc. agreed to sell certain of its cigarette brands, including Salem cigarettes, among others, to Imperial Tobacco Group, Plc. As part of the sale, R.J. Reynolds agreed to continue to assume all litigation liabilities

2

relative to Salem cigarettes.

7.     Defendant LIGGETT GROUP, LLC (f/k/ LIGGETT GROUP, INC., f/k/a BROOKE GROUP LTD, INC., f/k/a LIGGETT & MEYERS TOBACCO COMPANY) ("Liggett"), is a limited liability company authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Delaware, with its principal place of business located in the State of North Carolina.  At all times material to this cause of action, Liggett engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of various cigarette products.

8.     Defendant VECTOR GROUP LTD, INC. ("Vector") is a Delaware Corporation that conducts business in the State of Florida and has an office and representatives in Miami, Dade County, Florida.  Further, V principal place of business is in Miami-Dade County, Florida thereby rendering it a citizen of Florida.

9.     Liggett, Brooke Group, Ltd, Inc., ("BGL") and Brooke Group Holding, Inc. ("BGH") were Defendants in a class action in *Engle v. R.J. Reynolds Tobacco Company, et al.*, 945 So. 2d 1246 (Fla. 2006).  The Class was estimated to include several hundred thousand class members seeking damages against Defendants, including Liggett and BGL.  On July 7, 1999 after a lengthy jury trial and what is known as "Phase I" of the case, the jury found Liggett and BGL liable to the class, exposing them to substantial judgments for compensatory and punitive damages.

10.     In September and October 1999, Defendants Liggett and BGL undertook a sham reorganization of BGL that involved the creation of several new holding companies, multiple mergers, acquisitions and shuffling of BGL's assets, including Liggett, in an

3

attempt to mislead or defraud creditors, including *Engle* class members and/or to improperly divert revenues and assets of Liggett and BGL. The sham reorganization established Vector as the parent of BGH and Liggett (n/k/a LIGGETT GROUP, LLC).

11.     These transactions were the product of an actual intent on the part of these Defendants to hinder, delay, or defraud creditors, in violation of Florida's Uniform Fraudulent Transfer Act.

12.     In addition to the reorganization and transfer of assets described above, the management, officers, directors, personnel, location of operation, assets, liabilities, business operation, and stockholders of BGL remained the same when the name was changed to Vector; nominal consideration was involved in the reorganization; the vast majority of Liggett's revenues continued to be diverted to Vector to fund Vector's cigarette operations; and Bennett S. LeBow, through Vector, continued after the reorganization to exercise unilateral control over the assets of BGL and BGH (including the asset Liggett), as he had with the predecessor entities.

13.     Vector therefore is the successor of the original cigarette manufacturer, Liggett, which changed its name to Brooke Group, Ltd., Inc. Vector is a successor to BGL as a mere continuation of BGL and Liggett. Vector is a successor to BGL by way of de facto merger with BGL. Vector is also successor to BGH.

14.     Vector exercises such control over Liggett that Liggett is a mere instrumentality and/or alter ego of Vector. Assets and profits of Liggett have been and continue to be, improperly diverted from Liggett and BGL in an effort to mislead or defraud creditors and/or hide assets of Liggett and BGL, from creditors and for other improper purposes.

4

15.     Vector exercises such control over Liggett that Liggett is the agent of Vector and manifests no separate corporate interest of its own.  Vector acknowledges Liggett as its agent for purposes including, but not limited to, the sale, marketing, and distribution of tobacco products.  Liggett has accepted by act or word to be the agent of Vector and acquiesced in the control exercised over it by Vector.  Vector further exercises control over Liggett through the formation of Liggett Vector Brands, Inc., the company controlled by Vector, which now has taken over the sales and marketing of both Vector Tobacco, Inc., and Liggett.

16.     The Council for Tobacco Research – USA, Inc. ("Council for Tobacco Research") and the Tobacco Institute, Inc. ("Tobacco Institute"), at all times relevant to this action, were involved in promotion, lobbying, medical, research, legislative and political activities or related ventures, in connection with and on behalf of the Defendants throughout Florida and the United States.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court as Defendants conduct business in this jurisdiction.  Venue is proper in Duval County, Florida, pursuant to Section 47.051 Florida Statutes, as the cause of action accrued in Duval County, Florida, by virtue of Plaintiff developing lung cancer while residing in Duval County, Florida.

## IMPORTANT TOBACCO CONSTITUENTS

18.     The particulates that result from burning tobacco are collectively known as "tar."  The tar is the element in cigarettes that contains various carcinogenic chemicals which, with repeated exposure, cause various cancers including lung cancer.

5

19.     Nicotine, a dangerous drug, occurs naturally in the tobacco plant and is addictive. When a cigarette is smoked, the nicotine in the tobacco is carried on the tar into the lungs. From there, the nicotine gets absorbed into the bloodstream and arrives at the brain within about seven to ten seconds. In the brain or in the lungs, nicotine binds to nicotinic acetylcholine receptors, which triggers the release of various hormones, including dopamine, norepinephrine and acetylcholine. The release of these hormones causes the smoker to feel good, satisfies the craving for food, helps the smoker feel more alert and assists with arousal and cognitive function.

20.     Repeated smoking cigarettes with addictive levels of nicotine results in certain brain changes known as neuroplasticity, meaning new brain circuits or connections. These physiological changes from nicotine cause the smoker to feel withdrawal symptoms when the nicotine level in the brain drops below the level to which the smoker is accustomed. These symptoms include feelings of nervousness, edginess and anxiousness. The antidote to replenish the low level of nicotine in the brain is another cigarette.

21.     Menthol is an anesthetizing agent that, when added to the tobacco in a cigarette, numbs the sensory organs in the throat, making it easier to inhale the smoke more deeply, allowing more nicotine to be delivered to the body. By making cigarette smoke milder and easier to inhale, menthol makes it easier for young people to start to smoke.

### CIGARETTES AND DISEASES

22     Scientific and medical evidence has established that cigarette smoking causes lung cancer of various cell types, chronic obstructive pulmonary disease

6

("COPD"), emphysema, chronic bronchitis, bladder cancer, coronary heart disease, laryngeal cancer, and other cancers and diseases.

23.     Each of the smoking-related diseases referenced above are dose dependent, that is, each and every exposure to cigarette smoke increases the risk of disease, including lung cancer.

## MODIFYING TOBACCO CONSTITUENTS

24.     Since the 1930s and certainly by the 1940s, American Tobacco Company, Liggett and R.J. Reynolds knew that nicotine could be removed from tobacco through thermal and other methods, so as not to create and sustain addiction and/or dependence.

25.     Since the early 1960s, R.J. Reynolds has known that by using expanded tobacco, which increases tobacco filling capacity and renders the tobacco dryer and lighter when burned, there is very little tar in the particulates from the burning tobacco, resulting in lower transmission of nicotine and a less addictive cigarette.

26.     Since at least the 1950s, American Tobacco Company, Liggett and R.J. Reynolds have used reconstituted tobacco in their cigarettes, including those American Tobacco Company and R.J. Reynolds cigarettes that Benjamin Mathews smoked. Reconstituted tobacco is an engineered form of tobacco from which nicotine is extracted and later reinjected to achieve a precise dosage.

27.     The use of reconstituted tobacco is a method that could be used to reduce the level of nicotine, and although available to American Tobacco Company, Liggett and R.J. Reynolds they chose not to avail themselves of that process of nicotine reduction to make a less deadly cigarette.

7

## CIGARETTES ARE INHALABLE BY DESIGN

28.     A "cigarette" is any roll of tobacco wrapped in paper.     15 U.S.C. §
1332(1)(A)(1).

29.     "Flue curing" is a curing process whereby tobacco is heated through tubes,
known as flues, trapping the native sugar in the tobacco leaf, producing a very mild and
most importantly, an inhalable smoke.

30.     When tobacco in cigarettes is burned the smoke from the tobacco contains
numerous carcinogens and other toxic substances.

31.     During the 19th century, in the United States, the three most popular ways
in which tobacco was used were chewing, smoking it in a pipe or smoking it wrapped in
a tobacco leaf, commonly known as a cigar.  Cigarettes were used during this time, but
on a much smaller scale.

32.     During the 19th century, in the United States, the tobacco used to chew,
smoke in a pipe, in a cigar or cigarette was air-cured, producing a very harsh alkaline
smoke that could not be inhaled into the lungs.  Thus, it was very rare for people to inhale
smoke of any kind prior to the 20th century, and therefore, cancer in any of the major
internal organs was a rarity.

33.     In the early 20th century, "flue cured" tobacco was used by cigarette
companies in the United States, including American Tobacco Company, R.J. Reynolds
and Liggett.  This rendered cigarettes easily inhalable so that when used as intended they
were likely to cause various types of cancers, including, lung cancer.  It was inhalation
that allowed the carcinogens and other toxic substances produced by the burning
tobacco, to enter the blood stream and ultimately begin the disease process.

8

34.    In the early 20th century, menthol was used by companies in the United States that manufactured and sold cigarettes, including R.J. Reynolds.

35.    The use of "flue cured" tobacco by American Tobacco Company, Liggett and R.J. Reynolds in their cigarettes, including those American Tobacco Company and R.J. Reynolds cigarettes that Benjamin Mathews smoked, allowed the nicotine to be rapidly absorbed by the smoker, reaching the brain in seven seconds, thus beginning the addiction process.

### RISE IN SALES OF "FLUE-CURED" CIGARETTES

36.    At some point during the 19th century in the United States, there was concern that the spitting that accompanied chewing tobacco might hasten the spread of tuberculosis, which was a common, albeit contagious and dangerous disease at the time.

37.    This concern about spitting tobacco causing the spread of tuberculosis was heightened during World War I, when soldiers were fighting together in trenches and during the Spanish influenza pandemic of 1918-1919.  As a result, soldiers and civilians began smoking cigarettes as an alternative, putatively less dangerous form of tobacco use, replacing chewing tobacco.

38.    In addition to WWI and the Spanish Influenza, there were several other historical factors that were instrumental in popularizing cigarettes in the United States. These included:

a.    the use of flue-cured tobacco, rendering the cigarettes inhalable;

b.    the invention of safety matches, which made smoking mobile;

c.    the "Bonsack" machine, which produced up to 100,000 cigarettes per day and resulted in a drastic reduction in cigarette prices;

d.    WW II, when the U.S. Government provided free cigarettes that were

9

included in soldier's rations as mini packs, containing 3-4 cigarettes per day; and

e.  mass marketing, which included advertising through radio, television, billboards, human trademarks ("call for Philip Morris!"), vending machines, skywriting and product placement in movies, where actors and actresses were paid by cigarette companies to smoke a particular cigarette brand.

39.  Statistics demonstrate the influence these historical factors had on the popularity of cigarettes, as smokers in 1900 consumed an average of 54 cigarettes per capita, while in 1960 smokers consumed an average of 4,171 cigarettes per capita.

## INHALABLE FLUE-CURED CIGARETTES CAUSE
## MANY CANCERS AND OTHER DEADLY DISEASES

40.  American Tobacco Company and R.J. Reynolds, by design, through the use of flue-cured tobacco in the cigarettes Benjamin Mathews smoked, as well as Liggett, manipulated tar delivery, by virtue of their inhalability, so that when used as intended, they were highly likely to cause or to contribute to in substantial fashion, among other diseases and illnesses, lung cancer of various cell types, COPD, emphysema, chronic bronchitis, laryngeal cancer, stroke, bladder cancer, coronary artery disease and kidney cancer.

41.  Without the manufacturing designs utilized by American Tobacco Company, Liggett and R.J. Reynolds in their cigarettes, tobacco that was air-dried and rolled in paper would render the cigarette unreasonably harsh and therefore non-inhalable, resulting in little or none of the carcinogens and other toxic substances in the tobacco smoke reaching the lungs.

42.  Without the manufacturing designs utilized by American Tobacco Company, Liggett and R.J. Reynolds in their cigarettes, tobacco that was air-dried and rolled in paper would render the cigarette unreasonably harsh and therefore non-

10

inhalable, resulting in little or no nicotine reaching the brain and thus unable to create and/or sustain addiction or dependence.

**MANIPULATION OF NICOTINE LEVELS, INCLUDING "FREEBASING"**

43.     By as early as the 1930s, cigarette companies in the United States, that manufactured and sold cigarettes, including American Tobacco Company, Liggett and R.J. Reynolds, knew that nicotine in cigarettes was the primary reason smokers continued to smoke cigarettes.

44.     By as early as the 1930s, cigarette companies in the United States, that manufactured and sold cigarettes, including American Tobacco Company, Liggett and R.J. Reynolds, knew that nicotine could be easily removed from cigarettes by chemical and thermal methods.

45.     By as early as the 1930s, and continuing to today, cigarette companies in the United States, that manufactured and sold cigarettes, including American Tobacco Company, Liggett and R.J. Reynolds, while internally recognizing that nicotine was highly addictive, purposely manipulated the levels of nicotine in their cigarette products to a certain consistent amount, including those cigarettes smoked by Plaintiff, so as to create and sustain addiction and/or dependency to the nicotine in their cigarettes, resulting in compulsive smoking by virtue of addiction and therefore excessive exposure to carcinogens and other toxic substances, likely leading to the development of various types of cancers, including lung cancer.

46.     By at least in or around the late 1960s and continuing to at least as late as in or around June 2015, Liggett and R.J. Reynolds manipulated the potency of the nicotine in the cigarettes they manufactured and sold, including R.J. Reynolds cigarettes smoked

by Plaintiff, namely Salem, by adding ammonia and/or diammonium phosphate or other hydroxides to the tobacco in their cigarettes, that transformed the nicotine molecule from a salt state to a free state. This transformation, referred to as "freebasing," resulted in the nicotine being in a more volatile, potent form, rapidly absorbed by the smoker, and instantly perceived by the smoker as a nicotine "kick," leading to earlier onset of addiction to the nicotine in those cigarettes, creating an unreasonable risk of danger to the user, including Benjamin Mathews, when Salem cigarettes were put to normal use, by virtue of excessive exposure to carcinogens and other toxic substances in those cigarettes, likely to cause or contribute to, in substantial fashion, among other diseases, lung cancer.

47.   American Tobacco Company and R.J. Reynolds' cigarette products, including those which were manipulated to increase the quantity and potency of the nicotine, smoked by Plaintiff, rendered their cigarettes, including Lucky Strike and Salem, more addictive and habituating. Addiction in turn would lead to compulsive smoking, resulting in the inhalation of more carcinogens and toxic substances, so that when used as intended, those cigarettes were highly likely to cause, or contribute to in substantial fashion, among other diseases and illnesses, lung cancer of various cell types, bladder cancer, emphysema, chronic bronchitis, laryngeal cancer, coronary heart disease, stroke, and kidney cancer.

48.   While nicotine occurs naturally in the tobacco plant there are numerous variables that determine the amount of nicotine in the plant, including the spacing of the plants, the particular climate conditions and the particular leaves that are used in manufacturing cigarettes. That said, without the manufacturing designs utilized by American Tobacco Company, Liggett and R.J. Reynolds in their cigarettes, tobacco that

was air-dried and rolled in paper would not only be unreasonably harsh and non-inhalable, but there would be fluctuations in the amount of nicotine in the tobacco, rendering the cigarette either too harsh due to too much nicotine and thus, not palatable, or with not enough nicotine to create and sustain addition and/or dependence.

49.    As a result of Benjamin Mathews smoking Lucky Strike and Salem cigarettes, manufactured, distributed and sold by American Tobacco Company and R.J. Reynolds, the designs of which were manipulated through the use of flue-cured tobacco, consistent addictive levels of nicotine and the use of menthol and other flavorings, he became addicted to the nicotine in the cigarettes he smoked and the consistent addictive levels sustained his addiction to the nicotine in the cigarettes he smoked, resulting in compulsive smoking and therefore excessive exposure to carcinogens and other toxic substances in the Lucky Strike and Salem cigarettes he smoked over the many years of his smoking history.  This cumulative exposure caused or contributed to, in substantial fashion, the development of Benjamin Mathews's lung cancer.

### "TIRC" AND "COUNCIL FOR TOBACCO RESEARCH": THE CIGARETTE MAKERS CONSPIRE TO DENY THAT CIGARETTES CAUSE CANCER

50.    In 1953, Dr. Ernst Wynder published an article titled, *"Experimental Production of Carcinoma with Cigarette Tar"* in the journal Cancer Research.  Dr. Wynder had conducted experiments painting cigarette tar on the backs of mice, which then developed tumors on their backs.

51.    That same year, cigarette makers, including R.J. Reynolds, hired scientists who confirmed that cancer rose dramatically as people smoked more cigarettes.

52.     Indeed, in a February 2, 1953 internal report, R.J. Reynolds concluded that, "studies of clinical data tend to confirm the relationship between heavy and prolonged tobacco smoking and incidence of cancer of the lung."

53.     In response to these early research studies, cigarette makers, including Liggett, R.J. Reynolds and other cigarette companies, carried out, together and through the TIRC, Council for Tobacco Research and the Tobacco Institute, a campaign designed to deceive the public, Benjamin Mathews, physicians, federal and state governments, and others as to the true dangers of smoking cigarettes and for many years succeeded in their endeavor.

54.     On or about December 14 ,1953, cigarette makers, including R.J. Reynolds and others, met at the Plaza Hotel in New York City and reached what has been called a "gentleman's agreement" with the object of conspiring to defraud the public.

55.     In January 1954, these cigarette makers, and others, formed and funded the "Tobacco Industry Research Committee" ("TIRC"). The TIRC expressly pledged to provide aid and assistance to the research effort into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility, paramount to every other consideration -- thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking.

56.     On January 4, 1954, the TIRC published an advertisement in over 400 newspapers circulated in North America titled, "A Frank Statement To Cigarette Smokers," making claims about the safety of cigarette smoking which were thereafter reiterated and reinforced by advertisements and public interviews given by cigarette executives over the next several decades.    Among other representations these

14

conspirators knew were false, the "Frank Statement" claimed, "That there is no proof that cigarette smoking is one of the causes" of lung cancer.

57.    A March 15, 1961 confidential Liggett & Meyers (now Liggett) document stated in part, "There are biologically active materials present in cigarette tobacco.  These are: a) cancer causing b) cancer producing, c) poisonous . . . ."

58.    In 1964, the TIRC changed its name to the Council on Tobacco Research and was funded by the co-conspirator cigarette makers, including Liggett, then known as Liggett & Myers.  Liggett had previously joined the conspiracy in 1958 as one of the founding members of the Tobacco Institute.

59.    Despite R.J. Reynolds and other cigarette companies' "promise," which purposely created the illusion that scientific research into the dangers of smoking was being conducted, the results of which would be made public, they concealed information regarding the lack of bona fide research being done by the TIRC and Council for Tobacco Research into the health hazards of smoking, and the lack of funds being provided for research by the TIRC and Council for Tobacco Research into the health hazards of cigarettes, which was the purported purpose for which the TIRC and Council for Tobacco Research were established.

60.    The truth is that joint industry efforts undertaken by the TIRC and the Council for Tobacco Research were neither disinterested nor objective.    Industry documents, recently revealed, show that the TIRC and Council for Tobacco Research functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation.    Instead, the TIRC and Council for Tobacco Research were used to support an industry strategy of denying or creating doubt that

15

smoking causes disease. At the same time, Liggett, R.J. Reynolds and other co-conspirator cigarette companies, continued to represent publicly that there was no proof cigarette smoking was one of the causes of, or contributing factors to cancer or any other diseases.

61.     In order to sell more cigarettes over the last 65 years, the TIRC and its successor Council for Tobacco Research, together with the Tobacco Institute Inc., Liggett, R.J. Reynolds and other co-conspirator cigarette makers, withheld, denied and failed to disclose the truth they knew about the dangers of cigarette smoking, including that, cigarettes are highly addictive and caused lung cancer of various cell types, bladder cancer, COPD, emphysema, chronic bronchitis, and other diseases. Meanwhile, these conspirators repeatedly promised the public that they would truthfully disclose relevant information regarding the health risks associated with their cigarettes.

62.     The success of this conspiracy depended upon the concerted action of the cigarette makers (in a so-called "gentleman's agreement"). Otherwise, the revelation by one company of what it knew about the health consequences of smoking and/or the availability of a "safe" or "safer" cigarette and/or the addictive nature of the manufacturers' cigarette would have thwarted the conspiracy.

63.     Liggett and R.J. Reynolds' internal company documents prove that they knew the dangers of smoking but withheld this information from Benjamin Mathews, at the time he began smoking their cigarettes and for decades thereafter.

### THE FRAUD OF FILTERS

64.     As early as the 1950s, at a time when unfiltered cigarettes were the most popular type of cigarette, the cigarette makers' internal company documents, including

16

R.J. Reynolds, reflected the ineffectiveness of filters in removing cancerous components. Nevertheless, the tobacco companies, including R.J. Reynolds and other co-conspirators, through their advertising campaigns, via radio, television and other media outlets, throughout the 1950s and 1960s and beyond, as part of the conspiratorial objective to create a false controversy as to the hazards of cigarette smoking, subtly noted that filters, which were being added with great frequency to cigarettes, were a "safer" and "better" alternative than unfiltered cigarettes.  By the early 1960s, filtered cigarettes had overtaken unfiltered cigarettes as the most popular cigarettes in the United States.

65.    In a December 17, 1953 internal R.J. Reynolds document, titled, "Filter Tip Materials Undergoing Color Change on Contact with Tobacco Smoke," Claude Teague, an R.J. Reynolds chemist, discussed the possibility of using chemicals in the filter tip materials that would darken or change color on contact.  He concluded, "While use of such color change materials would probably have little or no effect on the actual efficiency of the filter tip material, the advertising and sales advantages are obvious."

66.    That year, a confidential Philip Morris Inc. document titled "*Tobacco and Health – R&D Approach*" concluded, "Carcinogens are found in practically every class of compound in smoke . . . filtration does not permit selective filtration of particulate smoke."

### THE FRAUD OF LIGHT, ULTRA-LIGHT, LOW TAR AND LOW NICOTINE CIGARETTES

67.    From at least as early as the 1970s and continuing to June 22, 2010, Liggett, R.J. Reynolds, and other cigarette companies, as part of the conspiracy, began aggressively marketing and advertising certain of their cigarette products as "light," "ultra-light," "low tar," and "low nicotine," through various print media, billboards (until 1999), sponsorship activities and affixing those labels on individual cigarette packages.

17

68.    By touting these misleading euphemisms, to conceal the hazards of smoking, Liggett, R.J. Reynolds and other cigarette companies, provided an ersatz "safer" alternative cigarette to smokers, lower in tar and nicotine and "light" and "ultra-light," in order that smokers would continue smoking their products rather than quitting smoking altogether.

69.    Liggett, R.J. Reynolds and other co-conspirator cigarette companies knew that the notion that meaningful reductions in smoke exposure were achievable with "light" and "ultra-light" cigarettes, ultimately resulting in reduced health risks, were patently false. That is because "light" and "ultra-light" cigarettes were specifically engineered to produce low yields of tar and nicotine when smoked by a machine, according to a standardized protocol, that is, a 35 ml, two-second puff taken approximately once a minute until a fixed butt length was reached.  This protocol for measuring cigarette yields became known as the "FTC method."

70.    The parameters used by the FTC method, however, did not accurately reflect the true behavior of actual smokers.  Smokers routinely take longer, harder and more frequent puffs in order to reach their desired dose of nicotine.  Additionally, the machine measured yield of "light" and "ultra-light" cigarettes was heavily influenced by small ventilation holes in the cigarette filters, placed there by design, to dilute the stream of inhaled smoke with air.  However, the ventilation holes facilitated the taking of bigger puffs and were often blocked by the smokers' lips or fingers.  Thus, as a result of human smoking behavior, standardized tar and nicotine yields based on the FTC method considerably underestimated actual human exposure, of which Liggett, R.J. Reynolds and other co-conspirator cigarette companies were aware.

71.    On June 22, 2010, the FDA ended the "light," "ultra-light," "low tar" and "low nicotine" deception when it banned cigarette companies from using these false labels relative to their cigarette products.

## FROM THE 1950S AND CONTINUING FOR MANY DECADES, LIGGETT, R.J. REYNOLDS ANDTHEIR CO-CONSPIRATORS FALSELY DENIED KNOWING THAT CIGARETTES WERE DEADLY

72.    An April 15, 1968 internal Tobacco Institute memorandum stated, "Our basic position in the cigarette controversy is subject to the charge, and may be subject to a finding, that we are making false or misleading statements to promote the sale of cigarettes."

73.    The cigarette manufacturers, including Liggett, R.J. Reynolds and other co-conspirator cigarette makers, questioned any scientific research that concluded that cigarettes were a health hazard, either directly or through the Tobacco Institute, via media campaigns, mailings to doctors and other scientific professionals, as well as through testimony before governmental bodies.  As examples:

a.    From the mid-1950s through at least the 1970s, executives from Liggett, R.J. Reynolds, American Tobacco Company, Lorillard and other cigarette companies frequently appeared on national television news shows, such as "See It Now," hosted by Edward R. Murrow, to refute any contention that cigarettes were a cause of cancer or otherwise dangerous to health.

b.    In 1964, when the Surgeon General's Report was issued and became one of the most covered news stories in recent times because of its conclusion that cigarettes were a cause of lung cancer in men, Liggett, R.J. Reynolds, and other cigarette company executives responded on national and international television programming, local news stations and local newspapers throughout the United States, denying that cigarettes were a cause of lung cancer or any other type of cancer and cautioning that more research was needed before that determination could be made.

c.    Throughout the 1970s and 1980s, the Tobacco Institute (on behalf of Liggett, R.J. Reynolds and other co-conspirator cigarette companies who provided funding to it), used spokespeople, including Anne Browder, Bill Dwyer and Brennan Dawson, who appeared on national programs throughout the United

19

States, including Ted Koppel's "Nightline," and 20/20 and denied any causal connection between smoking and disease. The common mantras among the various spokespersons, were that there was no causal connection between smoking and disease, including cancer, there were not enough facts to conclude that smoking was a cause of cancer and that only a small percentage of smokers developed cancer.

d.     In 1983, a Tobacco Institute spokesperson publicly stated, "We don't know what causes the ailments that have been attributed to cigarette smoking . . . . I don't think that there's a causal relationship established between cigarette smoking and any disease."

e.     In 1984, R.J. Reynolds took out advertisements in major newspapers and magazines throughout the United States calling for an open debate regarding smoking's danger, which would show that smoking does not cause cancer.

f.     A tobacco spokesperson stated in 1984 that "[i]t is not known whether cigarettes cause cancer."

g.     After the 1988 Surgeon General's report asserted that nicotine was addictive, the Tobacco Institute released a statement that appeared in major newspapers, that said, "it has not been established that cigarette smoking produces a physical dependence to nicotine."

h.     In 1988 the tobacco companies, including R.J. Reynolds and other co-conspirators, publicly denounced the Surgeon General's conclusion on addiction, calling the report "irresponsible."

i.     In 1994, cigarette company executives from Liggett, R.J. Reynolds and other cigarette companies, testified under oath before Congress that nicotine was not addictive and that "it has not been proven that cigarette smoking causes cancer." This appeared on C-SPAN, and news of this testimony was covered by local news stations throughout the United States, including Jacksonville and throughout Duval County.

74.     Meanwhile, beginning in the 1950s when Benjamin Mathews began smoking cigarettes, Liggett, R.J. Reynolds and other cigarette manufacturers willfully concealed their knowledge of the dangers and addictiveness of cigarettes, including:

a.     the results of their own research into the health dangers posed by smoking cigarettes, including but not limited to the results of mouse skin painting experiments which proved that Liggett, R.J. Reynolds and other companies' cigarettes did in fact contain carcinogens;

20

b.      that smoking cigarettes greatly increased the risk of a smoker developing lung cancer of various cell types, bladder cancer, COPD, emphysema, chronic bronchitis, laryngeal cancer, stroke, coronary artery disease, kidney cancer and other forms of cancer, and/or sustaining other injuries and/or damages to the lungs, respiratory system, immune system, genetic makeup and other related physical conditions when used as intended;

c.      that smoke from Liggett, R.J. Reynolds and other companies' cigarette products caused damage to a smoker's respiratory tract, including but not limited to the ciliary escalator system utilized by the body to remove foreign particles from the lungs increasing the risk of the smoker contracting various respiratory ailments, including lung cancer of various cell types, COPD, emphysema and chronic bronchitis;

d.      that the diseases and/or injuries listed above would be more likely experienced if users such as Benjamin Mathews did not restrict their intake of R.J. Reynolds' cigarettes, or if they began to use such products at an early age;

e.      that use of R.J. Reynolds' cigarettes as intended was more likely than not to lead to addiction, habituation, physical and/or psychological dependence, particularly if begun at an early age;

f.      their failure to conduct adequate testing to determine whether cigarette smoking did lead to lung cancer of various cell types, bladder cancer, and other diseases, including COPD, emphysema and chronic bronchitis;

g.      the importance of animal experiments in determining the ability of cigarettes to cause disease in humans;

h.      the importance of epidemiological evidence in determining the ability of cigarettes to cause disease in humans;

i.      that reducing the number of cigarettes smoked per day would greatly reduce the risk of contracting a cigarette related disease, including, lung cancer of various cell types, bladder cancer COPD, emphysema, chronic bronchitis and other smoking related diseases;

j.      that smoking in excess of 5 cigarettes per day would likely lead to an addiction to or dependence on nicotine;

k.      the addictive and dependence producing nature of nicotine as contained in cigarette smoke;

21

l.      that termination or limitation of use would be exceedingly difficult if consumption were initiated, and that this difficulty would increase as cumulative consumption increased;

m.      the use of ammonia technology and/or certain tobacco blends to boost the pH of the cigarette smoke so as to increase the ratio of the "free base" form of nicotine (which is more easily absorbed by the smoker) to the acid salt form of nicotine (which is less readily absorbed) so as to allow for greater and more rapid absorption of nicotine by the smoker at lower levels of total dose rendering the free nicotine more potent and more addictive than bound nicotine;

n.      the use of tobacco high in nitrosamines, a potent carcinogen not found in green tobacco leaf but created during the tobacco curing process;

o.      that cessation of smoking, while reducing the risk of contracting certain cigarette related diseases, does not eliminate all risk;

p.      that cigarette smoking permanently alters certain receptor sites in the brain for nicotine making it more likely such individual will become or continue to be addicted to and/or dependent upon nicotine;

q.      that use of mild tobaccos, re-constituted tobacco, tobacco casings and flavorings, including menthol, in the manufacture of Liggett and R.J. Reynold's  cigarettes led to a cigarette less likely to trigger the smoker's own biological self defense mechanisms, the smoke of which was easier to inhale, inhale more deeply and hold in the lungs for a longer period of time which resulted in increased doses of carcinogens, such as Polycyclic Aromatic Hydrocarbons ("PAHs") and nitrosamines, and nicotine for the smoker even at lower levels of machine measured tar and nicotine yields;

r.      that switching to or initially smoking filtered, menthol, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

s.      that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker;

t.      the dose-response relationship between the various carcinogens and toxic substances contained in cigarette smoke and the risk of contracting lung

22

cancer of various cell types, bladder cancer, COPD, emphysema, chronic bronchitis, and other respiratory diseases;

u.     that cigarette manufacturers and sellers could develop a reasonable safe dose for foreseeable users;

v.     that there were feasible improvements in design, composition or manufacture of cigarettes such as to materially decrease the foreseeable risk to users such as Benjamin Mathews; and

w.     that developing knowledge before and after 1970 demonstrated that previous users are at great risk of harm, as set forth above, and should seek medical monitoring.

### MR. MATHEWS DID NOT KNOW THE HEALTH RISKS OF SMOKING

75.     When Benjamin Mathews began to smoke cigarettes at the age of 16, until many years later, he did not have actual knowledge of the likelihood of, or the severity of, the risks from the cigarettes he smoked, as indicated above, including the fact that smoking cigarettes could cause lung cancer of various cell types, bladder cancer, COPD, emphysema, chronic bronchitis or any other diseases, including different cancers.

76.     At the time that Mr. Mathews first began to smoke cigarettes until many decades later, he did not have actual knowledge of the likelihood of becoming addicted and/or dependent on the nicotine in the cigarettes he smoked, much less the fact that cigarettes contained nicotine and that nicotine was a dangerous addictive drug.

77.     The risks of harm to foreseeable users, as listed above, would increase with greater cumulative consumption, including the rate of consumption and length of time the cigarette products were consumed as well as with the earlier age in life of smoking initiation.

**CIGARETTE MAKERS'**
**AGGRESSIVE MARKETING**
**WITH SUPERIOR KNOWLEDGE**

78.     At all times material to this action, American Tobacco Company, Liggett,

R.J. Reynolds and other cigarette companies conducted aggressive marketing and

advertising campaigns intended to induce, encourage, suggest and reinforce foreseeable

users, including but not limited to, school-age children and teenagers to purchase their

cigarette products.

79.     American Tobacco Company, Liggett, R.J. Reynolds and other cigarette

companies targeted, among other groups, children and teenagers, with their aggressive

marketing and advertising campaigns, featuring radio, television, print and billboard

advertisements that created an image of smoking described by the Federal Trade

Commission in 1967 as "harmless and satisfying."   These advertisements were

consumed by teenagers, such as Benjamin Mathews.

80.     American Tobacco Company, Liggett, R.J. Reynolds and other cigarette

makers targeted children under the age of 18, as sought-after marketing targets of their

cigarettes, for decades.  This strategy was successful.  Approximately 87% of smokers

first used cigarettes by the age of 18.  In an R.J. Reynolds 1974 internal document, it

references its "young adult franchise" in 1960 as the 14-24 age group.

81.     Such marketing and advertising occurred in printed media, including various

magazines that had a large teenage readership; on television, which included many

television programs on prime time, that had large teenage and children viewership; radio,

billboards and by other means.  For example:

a.      Beginning in the 1930s and continuing for several decades, cigarette
companies, including American Tobacco Company, Liggett, R.J. Reynolds,

and others, used mass marketing to sell their cigarette products, including Lucky Strike, Salem and other cigarette brands, with famous athletes, politicians, actors and actresses pitching cigarette products on radio, television, magazines and newspaper advertisements and billboards.

b.   Through their advertisements, beginning in the 1930s, cigarette companies, including American Tobacco Company, Liggett, R.J. Reynolds and others, glamorized, sexualized and normalized cigarette smoking, creating a culture where cigarette smoking throughout the United States was ubiquitous, until 1982 when cigarette consumption peaked and thereafter began to decline such that the number of smokers today parallels the number of smokers in the 1930s.  However, it is only since 2002 that the number of former smokers has been greater than the number of current smokers.

c.   From the 1930s at least through the 1980s, cigarette advertisements celebrated happy relationships, a fun, carefree lifestyle, outdoor sports activities, physical fitness, beauty and independence.  However, while extolling these traits, the advertisements failed to advise of the health hazards and addictiveness of smoking cigarettes, choosing instead to conceal that information.

82.   In the 1930s through the 1950s, throughout New York and elsewhere around the country, American Tobacco Company heavily promoted Lucky Strike unfiltered cigarettes through various media outlets, including radio, local newspapers, magazines, television and billboards, using catchy jingles and misleading euphemisms to conceal the hazards of smoking, such as "Be happy, go Lucky," "It's toasted," "mild and smooth," "protects against irritation," and "LS/MFT, Lucky Strike means fine tobacco."

83.   In the early 1950s through at least the early 1970s, throughout New York, Connecticut and elsewhere around the country, R.J. Reynolds heavily promoted Salem mentholated filtered cigarettes through various media outlets, including radio, local newspapers, magazines, television (until late 1970), and billboards, using catchy jingles and misleading euphemisms to conceal the hazards of smoking, such as, "Salem softness freshens your taste," "menthol taste is country fresh" and "you can take Salem

out of the country but you can't take the country out of Salem"  Additionally, in the early 1950s and into the 1960s, during the Christmas holidays, R.J. Reynolds and other cigarette companies, through the various media outlets, implored people to give friends and relatives cartons of Salem and other cigarette brands, adorned with Christmas-themed motifs.

84.     Throughout the 1950s, many of the popular television shows airing nationwide, throughout the United States, including Bronx, New York, and elsewhere throughout New York City, were sponsored by cigarette companies and/or particular cigarette brands.  "The Hit Parade," a popular television show, was sponsored by Lucky Strike cigarettes, and the product was heavily advertised during the show.   "Arthur Godfrey and Friends," a hugely popular television show, was sponsored by Chesterfield cigarettes, manufactured at the time by Ligget & Meyers.  Chesterfield cigarettes were also a sponsor of "The Perry Como Show."

85.     Only recently, to some extent, has American Tobacco Company, Liggett, R.J. Reynolds and other cigarette companies' concealment been exposed.  Thus:

a.     According to the 2010 United States Surgeon General Report, <u>How Tobacco Smoke Causes Disease, The Biology and Behavioral Basis for Smoking-Attributable Disease,</u> "The evidence indicates that changing cigarette designs over the last five decades, including filtered, low-tar, and "light" variations, have not reduced overall disease risk among smokers and may have hindered prevention and cessation efforts."

b.     According to the 2014, United States Surgeon General Report, <u>The Health Consequences of Smoking – 50 Years of Progress</u>, "The tobacco epidemic was initiated and has been sustained by the aggressive strategies of the tobacco industry, which has deliberately misled the public on the risks of smoking cigarettes."

86.     Benjamin Mathews was induced to smoke cigarette products as a teenager, relied upon the manufacturers' superior knowledge regarding cigarette products and was

26

impliedly or expressly instructed in their use by American Tobacco Company, R.J. Reynolds and other cigarette companies' advertising, marketing and other efforts.

## SELLING CIGARETTES TO MR. MATHEWS

87.     Benjamin Mathews began smoking Lucky Strike unfiltered cigarettes in or around 1954 when he was 16 and living in Bronx, New York.  He continued smoking Lucky Strike cigarettes until 1956 when Salem cigarettes were introduced into the marketplace.  By the late-1950s, Mr. Mathews was smoking one pack or more of cigarettes per day.  Mr. Mathews continued smoking Salem brand cigarettes until he quit smoking in 1970.

88.     During his 16 years of smoking cigarettes, Benjamin Mathews smoked American Tobacco Company and R.J. Reynolds brand cigarettes in sufficient quantities such that his cumulative exposure to the carcinogens and other toxic substances in the Lucky Strike and Salem brand cigarettes he smoked caused and/or substantially contributed to the development of his lung cancer.

89.     While growing up in Bronx, New York, Mr. Mathews saw the pervasive misleading cigarette advertisements for Lucky Strike, Salem and other cigarette brands, from the cigarette companies in the various media outlets, including magazines, billboards and television, from American Tobacco Company, R.J. Reynolds and other cigarette companies.  Thus, by the time Mr. Mathews started smoking cigarettes, he was very familiar with the catchy phrases and jingles from the various cigarette advertisements, including "more doctors smoke Camel," "Winston tastes good like a cigarette should," and "L.S./M.F.T." (Lucky Strike means fine tobacco).

90.     Additionally, from the 1950s through the 1970s, Mr. Mathews had heard, seen

27

and read about the various public pronouncements from the various cigarette companies, including American Tobacco Company, R.J. Reynolds, and others, directly or through their representatives, including the Tobacco Institute, when the pronouncements were aired on local and national television programs that Mr. Mathews watched, as well as on the local radio stations that Mr. Mathews listened to, and appeared in local newspapers and magazines that he read, denying that smoking was a causal factor of smoking-related diseases and attacking government officials who espoused the causal link between smoking cigarettes and cancer and any other diseases.  It was these public pronouncements, designed to create a false controversy about the health risks of cigarette smoking, to sow doubt among smokers that cigarettes were hazardous to health, along with the ubiquitous cigarette advertisements that Mr. Mathews had seen and heard, that informed his confusion and ultimate belief that smoking was not yet proven to be a cause of cancer and other illnesses, including lung cancer and other diseases, until later, when he was an addicted smoker.  Unfortunately, and to his detriment, Mr. Mathews chose to trust the cigarette companies, including American Tobacco Company and R.J. Reynolds, who manufactured and sold the cigarettes he smoked, to be truthful about the health hazards of their products, namely, that they caused lung cancer and other diseases and that the nicotine in the cigarettes he smoked was addictive.

91.    Mr. Mathews was unaware of the extent of the danger and the addictive nature of R.J. Reynolds and other manufacturers' cigarette products, including the Lucky Strike and Salem cigarettes he smoked and that "light," "ultra-light," "low tar," "low nicotine" and/or filtered cigarettes were just as dangerous as regular filtered and unfiltered cigarettes.

28

92.     The cigarettes manufactured by American Tobacco Company and R.J. Reynolds during the time that Mr. Mathews smoked them, contained flue cured tobacco, menthol and other additives, and flavorants, rendering the cigarettes easily inhalable.  As well, those cigarettes had manipulated levels of nicotine, by design, resulting in every Lucky Strike and Salem cigarette Mr. Mathews smoked having a consistent amount of nicotine so as to create and thereafter, sustain addiction and/or dependence and able to easily enter the bloodstream through inhalation, reaching every major internal organ, thus, exposing those organs repeatedly, to the carcinogens and other toxic substances, creating an unreasonable risk of danger to the user, including Mr. Mathews, when put to normal use.

93.     During the early-1950s, at the time Benjamin Mathews started smoking cigarettes, the ordinary consumer, including Mr. Mathews, did not, in the exercise of ordinary diligence, know of the likelihood or the severity of, the risks from Defendant's cigarette products, as indicated above.  Thus, the cigarettes Mr. Mathews smoked in the 1950s, failed to meet reasonable expectations of consumers when used as intended.

### DEFENDANT'S CIGARETTES
### CAUSED MR. MATTHEWS' LUNG CANCER

94.     In or around 2018, at St. Vincent's Hospital, in Jacksonville, Florida, Benjamin Mathews was diagnosed with lung cancer, caused by his substantial exposure to the various components, including carcinogens and toxic substances in the cigarettes he smoked, that were manufactured by R.J. Reynolds.

95.     Mr. Mathews opted for surgery, as a curative protocol, to remove the part of the lung where the cancer was located.  Since his surgery, in 2018, he has not had any recurrence of his lung cancer.

29

96.     As a further direct result of R.J. Reynolds actions, Benjamin Mathews has suffered on-going pain throughout his body, loss of enjoyment of life and disability from the date of his diagnosis through the present and may likely endure future permanent pain and disability.

## SPECIFIC ALLEGATIONS

### COUNT I: STRICT LIABILITY (Design Defect)
### R.J. REYNOLDS TOBACCO COMPANY

97.     All of the allegations contained in the preceding paragraphs are realleged herein.

98.     Defendant, its predecessors-in-interest, their agents, and/or alter egos are and/or have been designers, manufacturers, advertisers, distributors and/or sellers of cigarette products.

99.     The products complained of were cigarette products designed, manufactured, advertised, distributed and/or sold by Defendant and used by the Plaintiff.

100.    The aforesaid products were distributed, supplied, sold and/or otherwise placed into the stream of commerce, and/or caused to be placed into the stream of commerce, by the Defendant.

101.    Plaintiff was exposed to Defendant's cigarette products over many years during which time smoke from Defendant's cigarette products was inhaled by the Plaintiff, the cumulative effect of which caused him to develop an addiction to nicotine and contract lung cancer.

102.    At the time Defendant designed, manufactured, advertised, marketed, distributed and/or sold the aforesaid cigarette products, such products were expected to and did reach Plaintiff, in a condition without substantial change from that in which such

30

products were when within the possession of Defendant.

103.   The Defendant's cigarette products, by reason of their design, were in a condition unreasonably dangerous to users, such as Plaintiff, and said products were expected to, and did, reach Plaintiff, without substantial change affecting that condition.

104.   Defendant's cigarette products, including those smoked by Plaintiff, namely, Salem, were, by reason of their design, in a condition unreasonably dangerous to users and/or bystanders, such as Plaintiff, and said products were expected to, and did, reach Plaintiff, without substantial change affecting that condition.

105.   The Defendant's cigarette products, including those smoked by Plaintiff, were unreasonably dangerous because a less dangerous design and/or modification was economically and scientifically feasible, including, but not limited to, the discontinuation of the use of flue cured tobacco, and the use of air-dried tobacco without adding sugar and flavorants, thereby rendering their cigarettes non-inhalable and the removal of enough nicotine from their cigarettes so as not to create and/or sustain nicotine addiction, dependency and/or habituation.  In that regard, addiction to nicotine would be a rarity and therefore, without a compulsion to smoke, diseases such as lung cancer, would significantly decline.

106.   Defendant's cigarette products, including those smoked by Plaintiff, were in a defective condition and unreasonably dangerous to foreseeable users, for the following additional reasons:

> a. due to their design, when such cigarette products were used as intended, caused or contributed to the illnesses listed in paragraph 22, including lung cancer;
>
> b. due to their design, were addictive, and did not provide an adequate warning, through non-advertising and non-promotional communications, of

the potential harm that might result from exposure to said products;

c. failed to have adequate instructions for safer use of the products, including, but not limited to:

1  Directions to smoke fewer cigarettes
2  Directions to avoid blocking vent holes
3  Directions to attempt to quit smoking
4  Directions to avoid compensatory smoking
5  Directions to avoid smoking entire cigarettes
6  Directions to avoid exceeding the addiction threshold
7  Directions to seek regular physical examinations

d. by design contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful to users, including the Plaintiff, through easy inhalation to the lungs and bloodstream;

e. contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful when and after it became feasible to design and manufacture reasonably comparable products not containing those substance or containing less of them, or not allowing those substances to reach the lungs and enter the bloodstream through inhalation;

f. through the use of filters, manufacturing methods, engineering methods and/or materials utilized, were designed in such a way to make smoking Defendant's cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all;

g. utilized tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

h. failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable;

i. the risk of danger to users and/or bystanders, such as Plaintiff outweighed their benefits obtained with the use of the products;

j. by design, contained manipulated levels of nicotine to prevent Plaintiff,

who became addicted to the nicotine in Defendant's cigarette products, from deciding to try quitting, quitting and/or reducing consumption of Defendant's cigarette products;

k.  by design, contained artificially high levels of nicotine (including bound and free forms of nicotine), in Defendant's cigarette products which were designed to sustain addiction to nicotine and prevent Plaintiff, and other persons similarly situated from deciding to try quitting, quitting, and/or reducing consumption;

l.  by engineering a cigarette with defective designs which increased the risk of becoming addicted to smoking and developing lung cancer and other diseases, by utilizing design changes such as filters, chemical adjustments, and flavoring, including menthol, while simultaneously marketing their products as less tar than regular cigarettes, and thus more injurious to health;

m.  by designing, promoting and selling filtered, menthol, low tar, low nicotine and/or "light" cigarettes while marketing these brands as less hazardous;

n.  by treating tobacco with ammonia causing the nicotine to be transformed into a free state, thereby causing rapid absorption into the bloodstream and thus increasing the potency and addictiveness of their cigarette products;

o.  by using flue-cured tobacco resulting in Defendant's cigarettes being inhalable.

107.   Plaintiff was unaware of the defective and unreasonably dangerous condition of the Defendant's cigarette products and at a time when such products were being used for the purposes for which they were intended, was exposed to and inhaled and breathed smoke from Defendant's cigarette products.

108.   Defendant knew that its cigarette products would be used without inspection for defects, and by placing them on the market, represented that they would be safe.

109.   Plaintiff was unaware of the hazards and design defects in the cigarette products of the Defendant, to wit:  that exposure to said manipulated products would cause Plaintiff to develop cigarette related diseases, including lung cancer, which made

33

said products unsafe for use.

110.   Plaintiff was caused to contract lung cancer in addition to other related physical conditions which resulted in and directly caused him to suffer bodily injuries;

111.   As a direct and proximate result of Defendant's defective products, Plaintiff developed injuries, including but not limited to lung cancer, in addition to other related physical conditions which resulted in and directly caused him to suffer bodily injures.

112.   Plaintiff demands judgment against Defendant for damages, including but not limited to, past and future medical expenses, mental anguish, embarrassment, pain and suffering, and loss of enjoyment of life, as a direct and proximate result of Defendant's defective cigarettes.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages; all recoverable costs for this action; all legally recoverable interest; and any other relief to which Plaintiff may be legally or equitably entitled and furthermore demands trial by jury of all issues so triable as of right.

## COUNT II: NEGLIGENCE
## R.J. REYNOLDS TOBACCO COMPANY

113.   All of the allegations contained in the preceding paragraphs are realleged herein.

114.   The products complained of, including Lucky Strike and Salem brand cigarettes, were  designed, manufactured, advertised, marketed, distributed and/or sold by Defendant, its agents and/or alter egos and predecessors-in-interest, which Plaintiff used and smoked in his daily life.

115.   Plaintiff was exposed to and did inhale smoke from cigarette products which were  designed, manufactured, advertised, marketed, distributed and/or sold by

34

Case 3:21-cv-01071-TJC-MCR   Document 1-1   Filed 10/25/21   Page 36 of 47 PageID 52

Defendant, its agents and/or alter egos and predecessors-in-interest, as both a user and

bystander of the products.

116.    Each exposure to such cigarette products of Defendant caused Plaintiff to

inhale smoke from said products which caused Plaintiff to develop an addiction to the

cigarette products and caused lung cancer, in addition to other related physical conditions

which resulted in, and directly caused him to suffer bodily injuries.

117.    Each exposure to such products was harmful and the cumulative effect of

smoking such products caused or significantly contributed to the development of Plaintiff's

lung cancer.

118.    Plaintiff's aforementioned injuries arose out of, were connected to and

incidental to the design, manufacture, advertisement, marketing, distribution and/or sale

by Defendant of its cigarette products.

119.    At all times material to this action Defendant had the following legal duties

to users who consumed their cigarette products, including Plaintiff:

        a.    prior to July 1, 1969, a duty to foreseeable users of Defendant's
cigarette products to warn of the likelihood, probability or
foreseeability that the harms listed in paragraph 22 above would or
might occur if the products were used as intended;

        b.    prior to July 1, 1969, a duty to foreseeable users to warn that the
harms listed above would be more likely experienced if users did not
restrict their intake of Defendant's cigarette products and/or to
provide some guidelines on reasonably safe dosage or amount of
consumption and a duty to warn that use of their product at an early
age was most harmful;

        c.    prior to July 1, 1969, a duty to warn foreseeable users that the use
of the Defendant's cigarette products was likely to lead to addiction
and/or dependence;

        d.    prior to July 1, 1969, a duty to warn users that termination or
limitation of use would be exceedingly difficult if consumption was

35

initiated, and that this difficulty would increase as cumulative consumption increased;

e.    a duty to design, manufacture and sell a product that when used as intended was reasonably safe for foreseeable users;

f.    a duty to make such feasible improvements in design, composition or manufacture of cigarette products such as to materially decrease the foreseeable risk to users;

g.    a duty to disclose to consumers of their cigarette products of their own and other scientific research known to them which indicated that use of cigarette products as intended exposed users to a great risk of harm as described in paragraph 22 above;

h.    a duty to warn previous users, users and foreseeable users through non-advertising and non-promotional communications of the harms listed in paragraph 22 above;

i.    a duty to promote and/or advertise their cigarette products in a manner which did not mislead, or misrepresent to consumers, the true health dangers posed by use of the product as intended;

j.    a duty to discontinue the manufacture, distribution and sale of Salem cigarette products, when Defendant knew at the time of said manufacture, distribution and/or sale that such products, by virtue of their design, could cause, and in fact were more likely to cause, the harms described in paragraph 22, when used as intended, knowing that alternative, less deadly and commercially feasible design protocols were available.

120.    Defendant negligently breached one or more of the duties to users including Plaintiff, which was the proximate cause of Plaintiff's injuries and disabilities in one or more of the following ways:

a.    in failing to test, test adequately or conduct scientific research on their cigarette products for harmful or addictive properties and in failing to establish a reasonably safe dose for foreseeable users;

b.    in designing, manufacturing and selling a product that when used as intended was not reasonably safe for foreseeable users;

c.    in failing to remove and recall all said cigarette products from the stream of commerce and the marketplace upon ascertaining that

said products would cause those harms listed in paragraph 22, above;

d.     in manipulating the quantities of nicotine and/or failing to reduce and/or eliminate nicotine from Defendant's cigarette products to prevent Plaintiff from becoming addicted to the nicotine in Defendant's cigarette products;

e.     in manipulating the quantities of nicotine and/or failing to reduce and/or eliminate nicotine from Defendant's cigarette products to prevent Plaintiff, who was addicted to the nicotine in Defendant's cigarette products, from quitting and/or reducing consumption;

f.     in adding consistent addictive levels of nicotine or artificially high levels of nicotine (including bound and free forms of nicotine), in Defendant's cigarette products to prevent Plaintiff from quitting and/or reducing consumption;

g.     in failing to make such feasible improvements in design, composition or manufacture of their cigarette products such as to materially decrease the foreseeable risk to users;

h.     in failing to disclose to Plaintiff and other foreseeable users of their cigarette products of the Defendant's own scientific and other scientific research known to them which disclosed that use of cigarette products as intended cause a great risk of harm as described in paragraph 22, above;

i.     in failing to promote and/or advertise their products in a manner which did not mislead or misrepresent to Plaintiff and other foreseeable users the true health dangers posed by use of their products as intended;

j.     in failing to warn or warn adequately, through non-advertising and non-promotional communications, of the likelihood, probability or foreseeability that the harms listed in paragraph 22 above would or might occur if the products were used as intended;

k.     in failing to warn or warn adequately, through non-advertising and non-promotional communications, that the harms listed above would be more likely experienced if users did not restrict their intake of Defendant's cigarette products and/or in failing to provide some guidelines on reasonably safe dosage or amount of consumption and/or in failing to warn that use of the product at an early age was exceedingly harmful;

37

l.   in failing to warn or warn adequately, through non-advertising and non-promotional communications, that use of the products as intended was likely to lead to addiction, habituation or dependence;

m.   in failing to warn or warn adequately, through non-advertising and non-promotional communications, that termination or limitation of use would be exceedingly difficult if consumption was initiated, and that this difficulty would increase as cumulative consumption increased;

n.   in failing to warn or warn adequately, prior to July 1, 1969, through advertising and promotional communications, of the likelihood, probability or foreseeability that the harms listed in paragraph 22 above would or might occur if the products were used as intended;

o.   in failing to warn or warn adequately, prior to July 1, 1969, through advertising and promotional communications, that the harms listed above would be more likely experienced if users did not restrict their intake of Defendant's cigarette products and/or in failing to provide some guidelines on reasonably safe dosage or amount of consumption and/or in failing to warn that use of the product at an early age was exceedingly harmful;

p.   in failing to warn or warn adequately, prior to July 1, 1969, through advertising and promotional communications, that use of the products as intended was likely to lead to addiction, habituation or dependence;

q.   in failing to warn or warn adequately, prior to July 1, 1969, through advertising and promotional communications, that termination or limitation of use would be exceedingly difficult if consumption was initiated, and that this difficulty would increase as cumulative consumption increased.

121.   The Defendant knew that Plaintiff and others similarly situated would use and be exposed to its cigarette products in such a way as to cause Plaintiff to inhale the smoke from said products.

122.   Defendant knew that its cigarette products would be used by Plaintiff and other foreseeable users, without inspection for defects and that any such inspection would not have advised Plaintiff of the fact that the Defendant's cigarette products could cause

38

the injuries which he suffered.

123.    Plaintiff alleges that Defendant failed to use reasonable care, which is the care that a reasonably careful designer, manufacturer, seller, distributor and supplier would use under like circumstances.

124.    The Defendant's cigarette products, to which Plaintiff was exposed were used in the manner they were intended or reasonably foreseeable to Defendant.

125.    As a direct and proximate result of Defendant's negligence, Plaintiff developed injuries, including but not limited to lung cancer, in addition to other related physical conditions, which resulted in and directly caused him to suffer bodily injuries.

126.    Plaintiff demands judgment against Defendant for damages including, but not limited to, past and future medical expenses, mental anguish, embarrassment, pain and suffering, and loss of enjoyment of life, as a direct and proximate result of Defendant's negligence.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages; all recoverable costs for this action; punitive damages; all legally recoverable interest, and any other relief to which Plaintiff may be legally or equitably entitled and furthermore demands trial by jury of all issues so triable as of right.

### COUNT III:  CONCEALMENT FRAUD CONSPIRACY
### R.J. REYNOLDS TOBACCO COMPANY
### LIGGETT GROUP, LLC and
### VECTOR GROUP, LTD

127.    All of the allegations contained in the preceding paragraphs are realleged herein.

128.    Beginning at least as early as on or about December, 14 1953 at the Plaza Hotel, New York, NY, and continuing even today, cigarette manufacturers, including R.J.

39

Reynolds and Liggett, Defendants herein, and Lorillard, American Tobacco Company, Brown & Williamson Tobacco Company, and other entities, including the TIRC, unlawfully agreed to conceal and omit and did in fact conceal or omit, information regarding the health effects of cigarettes and/or their addictive nature, with the intention that smokers and the public would rely on this information to their detriment. The conspirators agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means. For the next 65 years the scheme was well executed.

129. At all times material to this action, Defendants and their co-conspirators, as manufacturers and sellers of cigarette products, were in a position of superior knowledge regarding the dangerousness of those products greater than that of its customers and potential customers, including Plaintiff. Due to their greater knowledge and due to the hazards which Defendants and their co-conspirators knew were posed by the normal and intended use of their cigarette products, the Defendants and their co-conspirators owed their customers and potential customers, including Plaintiff, a duty to accurately and completely disclose to them information which they possessed or could have reasonably obtained regarding the dangers of the use of their cigarette products and to refrain from the dissemination of misleading and inaccurate information to them.

130. Plaintiff is unable to allege in full all such knowledge that the cigarette manufacturers and their co-conspirators, the Tobacco Institute Inc., TIRC, and Council for Tobacco Research, have withheld and/or failed to release over the last almost 65 years both because he does not have access to this information, and because to allege each and every such concealment of material fact herein would entail hundreds or even

thousands of pages of pleadings.

131.   Indeed, it is the cigarette manufacturers themselves, including Defendants herein, who have this knowledge and information, and are in the best position to know the contents of each and every such concealed fact.

132.   The concealed and omitted information referred to above, was material information.

133.   When R.J. Reynolds, Liggett and their co-conspirators made various public pronouncements and representations, that concealed material information regarding the health hazards and addictiveness of smoking cigarettes, they intended that the public, including the Plaintiff, would both believe in and rely upon such public announcements, and they knew or should have known that these pronouncements would permeate the public conscience and allow present and future smokers to believe that, despite what they may have heard elsewhere, the hazards of cigarette smoking had not been proven.

134.   By making the public pronouncements and statements referenced above, in addition to other such statements made to Defendants' customers, Defendants and their co-conspirators assumed voluntarily a duty otherwise imposed by law to disclose fully and honestly to Plaintiff and others, the health hazards of cigarette smoking and to refrain from making false and misleading statements in that regard.

135.   When Defendants and their co-conspirators made the above-referenced public pronouncements and statements, and concealed material information regarding the health hazards and addictiveness of smoking cigarettes, they knew or should have known that such concealed information was material to persons such as Plaintiff in making decisions on smoking and that such persons would rely and did rely upon

41

Defendants and their co-conspirators' false and misleading statements that concealed material information regarding the health hazards and addictiveness of smoking cigarettes.

136.   Defendants and their co-conspirators intended to induce Plaintiff to act or rely on the false and misleading statements that concealed material information about the health hazards and addictiveness of their cigarette products.

137.   The Plaintiff reasonably relied, to his detriment, upon the Defendants' and their co-conspirators' misleading and false statements that concealed material information regarding the health hazards and addictiveness of smoking cigarettes.  That is to say, Plaintiff relied on a misapprehension as to the facts concealed regarding the health hazards and addictiveness of smoking cigarettes, including those manufactured by Defendants, Liggett and R.J. Reynolds and other cigarette makers, when he made his smoking decisions, including smoking initiation and his continued smoking.  The aforementioned information and/or knowledge concealed and/or suppressed by Defendants and their co-conspirators, was concealed for the purposes of inducing the Plaintiff and others to smoke or fail to quit or reduce consumption.

138.   Had Defendants and/or their co-conspirators, at the time they became aware, publicly disclosed truthful information about the health risks and addictiveness of smoking their cigarettes, Plaintiff would not have started smoking cigarettes and/or would have attempted to quit smoking earlier than when he first made his initial quit attempts, thereby more likely than not avoiding the development of lung cancer.

139.   As a direct and proximate result of the aforementioned conspiracy to conceal and/or suppression of material information by Defendants and their co-

42

conspirators, Plaintiff smoked and/or continued to smoke R.J. Reynolds' cigarette products which caused him to develop injuries, including but not limited to lung cancer, in addition to other related physical conditions which resulted in and directly caused him to suffer bodily injuries.

140.   Plaintiff demands judgment against Defendants for damages including, but not limited to, past and future medical expenses, mental anguish, embarrassment, pain and suffering, and loss of enjoyment of life, as a direct and proximate result of the concealment fraud conspiracy.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages; all recoverable costs for this action; all legally recoverable interest; and any other relief to which Plaintiff may be legally or equitably entitled and furthermore demands trial by jury of all issues so triable as of right.

### COUNT IV:  CONCEALMENT FRAUD
### R.J. REYNOLDS TOBACCO COMPANY

141.   All of the allegations contained in the preceding paragraphs are realleged herein.

142.   Over the course of the last 65 years, Defendant made certain statements and/or representations to consumers, including Plaintiff, that concealed or omitted material facts, not otherwise known or available, about the health hazards of cigarettes and their addictiveness.

143.   When Defendant made these statements and representations, it intended that the public, including Plaintiff, would both believe in and rely upon such public pronouncements and it knew or should have known that these pronouncements would permeate the public conscience and allow present and future smokers to believe that,

43

despite what they may have heard elsewhere, the hazards of cigarette smoking had not been proven.

144.   By making the public pronouncements and statements referenced above, in addition to other such statements made to their customers, including the misleading euphemisms and catchy jingles in their advertising and promotion of their cigarette products, Defendant assumed voluntarily a duty to honestly disclose to Plaintiff and others, all relevant and material information regarding the health hazards and addictiveness of cigarette smoking.

145.   Nevertheless, Defendant, by and through its officers, employees and/or agents, engaged in an ongoing and continuous campaign to disseminate false and misleading information to its customers, including Plaintiff, and to withhold from them relevant and material information regarding the health hazards and addictiveness of consuming its cigarette products, including Salem cigarettes.

146.   The aforementioned information and/or knowledge concealed and suppressed by Defendant was material information which it was under a duty to disclose and which it had assumed the duty of disclosing.

147.   The aforementioned information and/or knowledge concealed and suppressed by Defendant was concealed for the purpose of inducing Plaintiff to smoke, fail to quit or reduce consumption for its own pecuniary gain.

148.   When Defendant made the above referenced public pronouncements in its advertising and promotional activities for its cigarette products and concealed material information regarding the health hazards and addictiveness of smoking cigarettes, it knew or should have known that such concealed information was material to persons such as

44

Plaintiff in making decisions on smoking and that such persons would rely and did rely upon Defendant's false and misleading statements that concealed material information regarding the health risks and addictiveness of smoking cigarettes.

149.   Defendant intended to induce Plaintiff to act or rely on the false and misleading statements that concealed material information about the health hazards and addictiveness of its cigarette products.

150.   Plaintiff reasonably relied, to his detriment, upon Defendant's misleading and false statements that concealed material information regarding the health hazards and addictiveness of smoking cigarettes.

151.   As a direct and proximate result of the aforementioned concealment fraud by Defendant, Plaintiff smoked and/or continued to smoke Defendant's cigarette products which caused him to develop injuries, including but not limited to lung cancer, in addition to other related physical conditions which resulted in and directly caused him to suffer bodily injuries.

152.   Had Defendant at the time it became aware, publicly disclosed truthful information about the health hazards and addictiveness of smoking its cigarettes, Plaintiff would not have started smoking cigarettes and/or would have attempted to quit smoking earlier than when he first made his initial quit attempts, thereby more likely than not avoiding the development of lung cancer.

153.   Plaintiff demands judgment against Defendant for damages including, but not limited to, past and future medical expenses, mental anguish, embarrassment, pain and suffering, and loss of enjoyment of life, as a direct and proximate result of the concealment fraud.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages; all recoverable costs for this action; all legally recoverable interest; and any other relief to which Plaintiff may be legally or equitably entitled and furthermore demands trial by jury of all issues so triable as of right.

DATED:  October 1, 2021                              TEIN MALONE LAW, PLLC
                                                     *Attorneys for Plaintiff*

                                                     11045 SW 69th Avenue
                                                     Pinecrest, FL  33156
                                                     Telephone (305) 442-1101
                                                     Email:  akaiser@teinmalone.com
                                                     Email:  tein@teinmalone.com

                                                     /s/ ALLAN B. KAISER
                                                     ALLAN B. KAISER, Esq.
                                                     Florida Bar No. 594628

                                                     /s/ MICHAEL R. TEIN
                                                     MICHAEL R. TEIN, Esq.
                                                     Florida Bar NO.  993522